## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JANE DOE,**

        **Plaintiff,**

**vs.**

**NEW COLLEGE OF FLORIDA, a Public**　　**Case No: 8:21-cv-01245-CEH-CPT**
**University and Member of the State**
**University System; and NEW COLLEGE**
**OF FLORIDA BOARD OF TRUSTEES, a**
**Florida Public Entity,**

        **Defendants.**

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff, JANE DOE, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 and Local Rule 3.01, hereby responds in opposition to Defendants' Motion for Summary Judgment [Doc. 86][1] served December 16, 2022, by Defendants, NEW COLLEGE OF FLORIDA and NEW COLLEGE OF FLORIDA BOARD OF TRUSTEES (collectively, "NCF"), and states as follows:

### I.   INTRODUCTION

This cause of action arises from a violent and brutal rape suffered by Plaintiff, Jane Doe, on the New College of Florida campus in Sarasota following a well-known annual event called the "Tour de Franzia," which took place in 2017 on May 13.

---

[1] Plaintiff hereby renews her objection to the late filing of NCF's Motion for Summary Judgment.

Defendants had actual knowledge that events organized by students revolving around drinking and drug use occurred on a **regular, annual basis**, and that each of these events, where students were able to drink or use drugs on campus, in direct violation of university policy.   The Tour de Franzia was just one of many "student-led traditions."   Furthermore, Defendants had actual knowledge that these "student-led traditions," where students could drink or use drugs **on campus** without supervision, directly and repeatedly resulted in sexual assaults against NCF students; yet, NCF intentionally ignored the warnings that annual events like the Tour de Franzia were well-known to coincide with a spike in sexual assaults and rapes taking place on NCF's campus.   This shows deliberate indifference to known harassment within NCF's programs; furthermore, this inaction resulted in a foreseeable zone of risk that NCF should have taken reasonable steps to mitigate.   Then, after Jane Doe reported her sexual assault, neither the Dean of Student Affairs nor the President of the University took any steps to follow the Title IX policy and open an investigation, evidencing their clearly unreasonable response to the Title IX report.

Defendants admit that Plaintiff suffered severe, pervasive and objectively offensive discrimination that resulted in a loss of educational opportunities, but dispute that they were deliberately indifferent to either the known risk of rape that coincided with student-led traditions before May 13, 2017, or to the actual reports of Title IX violations in May 2018.   Defendants also dispute that any such deliberate indifference subjected Jane Doe to the ongoing discrimination she suffered.   The record evidence reflects sufficient evidence that a reasonable jury could find each Defendant liable for

both negligence and Title IX violations.  Therefore, Defendant's Motion for Summary Judgment must be denied.

## II.   STATEMENT OF MATERIAL FACTS

The Tour de Franzia, a student-led tradition involving students riding bicycles from location to location while drinking Franzia wine, had already been established as an on-going annual event by the time Dr. Duane Khan first started at New College of Florida as a mental health counselor treating students in the 2013/2014 school year. Deposition of Duane Khan, Part I, taken Apr. 13, 2022 [Doc. 95] at 11:25-12:9, 14:19-15:14 (hereinafter, "DK Depo I").  Nearly four years later on May 13, 2017, Jane Doe took part in the event, where she was handed boxed wine by a Teacher's Assistant, in full view of Residence Assistants ("RAs") employed by the Office of Student Affairs. Plaintiff's Answers to Second Interrogatories (hereinafter "2d ROG Ans") at #13. Jane Doe and several other NCF students proceeded to drink wine and ride bicycles along a pre-determined route which began at the Bike Shop on campus and ended at the "Bayfront" – also on NCF's campus. Deposition of Jane Doe, taken Apr. 5, 2022 [Doc. 87] at 74:2-5, 79:5-13 (hereinafter "JD Depo").  At the Bayfront, students continued to drink unsupervised and undeterred by either NCF administration or police, and after taking a sip from a new drink handed to her by another participant, Cheikhou Kane, she immediately felt extremely disoriented and ill.  *Id.* at 115:19-116:3. Kane was able to steer her away from the party without interference from either the TA or RAs participating in the event, practically carry her across the NCF campus in her uncoordinated and disoriented state, stop at an on-campus convenience store,

3

walk her to his dormitory, and proceed to violently rape her for hours.  *Id.* at 117:19-128:17.

Jane Doe did not trust the administration, having learned in the past of mishandled Title IX reports.  2d ROG Ans. at 14.  She attempted to continue her education as if nothing had happened, but found herself suffering from post-traumatic stress and extreme anxiety as her rapist began stalking her and showing up places that he knew she would be, like outside her classrooms and inside her dormitory building. *Id.* at #13, JD Depo at 135:4-136:2.  Finally, after nearly a year had passed, Jane Doe took the courageous step of reporting the rape to the Dean of Student Affairs.  2d ROG Ans. at #14.  She told Dean Williamson that she'd been raped one year earlier, that the perpetrator was a student, and that he was about to graduate.  *Id.*  Without commencing any investigation, Dean Williamson told Jane Doe that nothing could be done to protect her or punish her attacker except to request a no-contact order be put in for the following year.  *Id.*  Jane Doe, utterly distraught by this news, decided the only way to protect herself from her attacker and stalker would be to withdraw from school.  *Id.*  She later told President Donal O'Shea that she left school because of sexual harassment, and he did nothing to initiate a Title IX investigation.  *Id.*

Although Defendants claim that no one knew at NCF knew about the Tour de Franzia, Jane Doe's mental health counselor, Dr. Khan, first learned about the existence of this annual event in 2013 from students who spoke openly on campus about this particular tradition, which began and ended on campus.  DK Depo I at 14:23-15:5. The Tour de Franzia is also well-known in the Sarasota community,

4

having been written about as recently as May 4, 2020, in the Sarasota Herald-Tribune and described therein as an "annual race/party, named for the cheap wine New College of Florida bike enthusiasts drink as they ride through the city at the end of each semester."  Ryan McKinnon, "Coronavirus Florida: College seniors cope with lost traditions," Sarasota Herald-Tribune, (May 5, 2020, 6:01 am) https://www.ncf.edu/news/coronavirus-florida-college-seniors-cope-with-lost-traditions/, attached hereto as Plaintiff's Exhibit "A".

Donal O'Shea, President of New College of Florida and Secretary of the New College of Florida Board of Trustees[2], testified at his deposition July 5, 2022, that he personally had no knowledge of such a tradition, Deposition of Donal O'Shea, Vol. II, taken July 5, 2022 [Doc. 92] at 161:5-9 (hereinafter DO Depo).  He testified to no knowledge, even though the New College of Florida's website featured and reproduced the Herald-Tribune article on May 4, 2020, over two years earlier.  *See* "Coronavirus Florida: College seniors cope with lost traditions," New College News (May 4, 2020), https://www.ncf.edu/news/coronavirus-florida-college-seniors-cope-with-lost-traditions/, attached hereto as Plaintiff's Exhibit "B".  Moreover, the on-campus police department knew about the Tour de Franzia and officers would regularly discuss their on-going frustration with the Tour de Franzia and other student-led traditions like it with Dr. Duane Khan.  Deposition of Duane Khan, Part II, taken Apr. 20, 2022 [Doc. 96] at 150:8-151:5 (hereinafter "DK Depo II").

---

[2] *See* Plaintiff's Exhibit E, New College of Florida Regulations Manual Chapter 2-1005, establishing that the President of New College of Florida also serves as an Officer of the Board of Trustees.

Regardless of the administration's knowledge of this specific event, drinking and drug use generally, and especially student-led traditions involving drinking and drug use such as the Tour de Franzia, were prevalent on the NCF campus and known by the administration and the President of the University to be occurring on an annual or regular basis at least since 2015. *See* Defendant's Exhibit 16, Draft of Task Force Recommendations [Doc. 102]. After two young adults died from a drug overdose on the NCF campus, NCF assembled a task force to address the problems of both drug and alcohol abuse on campus. DK Depo I at 85:6-87:1. President of the University and Secretary of the Board of Trustees, Donal O'Shea, personally invited Dr. Khan to participate on the task force with a number of other administrators, staff, and students, and the whole group met to discuss the issues involving alcohol and drug use on campus. *Id.* at 85:8 – 86:22. Before joining the task force, Dr. Khan and the NCF Counseling Office had seen a correlation between parties such as the Tour de Franzia, which promoted irresponsible alcohol use, or the Easter Egg Hunt, which promoted both illicit drug use and drinking on campus, and a sudden, noticeable increase in the incidence of sexual assaults happening on campus. *Id.* at 18:10-17, 19:12-21:16.

When the Drug and Alcohol Task Force assembled in May 2015 to discuss the problems of drug use and alcohol on campus, **Dr. Khan specifically reported his knowledge to the entire Task Force that unsupervised and unsanctioned annual student traditions involving drinking and drug use on campus, such as and including the Tour de Franzia, directly correlated with an increase in instances of**

**rape and sexual assault on campus**.  *Id.* at 89:16-90:16.  By August of 2015, the Task Force finalized its report with recommendations to address both drug and alcohol use and abuse on the NCF campus and presented those recommendations to the President of the University, who also served as Secretary of the Board of Trustees.  NCF revised its alcohol policies in accordance with the Task Force recommendations, but then failed to enforce the policies on May 13, 2017.  DK Depo II at 122:11-23.

Around the time that NCF assembled the Task Force, then-Dean of Student Affairs, Tracy Murry, was wearing many hats, including that of Title IX coordinator.  DK Depo I at 27:6-15.  After the Task Force completed its work and after Dean Murry left the University, NCF installed Robin Williamson as Dean of Student Affairs.  From the time that Robin Williamson started at NCF, the Title IX coordinators installed by Dean Williamson witnessed and testified to a series of violations of Title IX policy by Dean Williamson, Associate Dean of Student Affairs Mark Stier, and the University President/Secretary of the New College Board of Trustees, Donal O'Shea.

NCF was required to have Title IX coordinator by federal law and was supposed to list the name and contact information for the coordinator in a place that could be accessed by students by NCF's own Title IX guidance and policies.  Deposition of Rebecca Caskey, Part I, taken May 25, 2022 [Doc. 89] at 15:24-16:22 (hereinafter "RC Depo I").  Dr. Erin Robinson took on the role of Title IX coordinator from August 2016 through December 15, 2016.  Deposition of Erin Robinson, taken Apr. 11, 2022 [Doc. 103] at 7:20-8:4.  In the Summer of 2017, Rebecca Caskey (formerly Sarver), transitioned from the role of Dean Williamson's executive administrative assistant to

Director of Campus Programs and took on the additional responsibility of Title IX coordinator for NCF.  RC Depo I at 8:12-22; 9:8-14.  The person that would have been responsible for Title IX coordination in the interim between December of 2016 and the summer of 2017 would have been Dean Williamson.  *Id.* at 15:17-23.  Nevertheless, in March 2017, NCF still listed Dr. Robinson as the Title IX coordinator on its website. *Id.* at 17:3-17.  *See also* Exhibit 1 to RC Depo I, Archived Title IX information page from March 1, 2017, attached hereto as Plaintiff's Exhibit "C."  In her role as Title IX coordinator, Ms. Caskey received training in Title IX compliance and coordination and also trained all of the staff and faculty, including residence assistants, in Title IX compliance.  RC Depo I at 9:15-10:21. Ms. Caskey learned as part of her training that any kind of sexual misconduct, including rape or sexual assault, stalking, or sexual harassment, directly violates Title IX.  *Id.* at 20:17-21:4.

During her time at NCF, the students at NCF were "extremely vocal" and expressed "a lot of mistrust, distrust" with the administration and Defendant's process for dealing with Title IX reports or claims.  *Id.* at 13:11-21.  Ms. Caskey recalls the student body believing that the administration did not take Title IX reports "as seriously as they should be taken in terms of taking the cases in and investigating them fully."  *Id.* at 14:2-5.  Prior to Ms. Caskey taking on the responsibility of Title IX coordinator in addition to her Director of Campus Programs role, in terms of NCF's Title IX compliance, there were "things that were not done appropriately before [she] came into that position."  *Id.* at 14:16-23).  Ms. Caskey also observed various NCF administrators looking the other way at problems with Title IX compliance or asking

her to manipulate her investigative results as Title IX coordinator, which implicated the Title IX rights of the students and showed deliberate indifference to those rights. *Id.* at 14:24-15:5. Robin Williamson, the Dean of Student Affairs at NCF, had the authority to take corrective action to end any discrimination on campus by students against other students. DO Depo at 121:15-25, 123:1-19.  Dean Williamson had the responsibility to oversee any Title IX investigations and to follow the law concerning Title IX complaints and issues.  RC Depo I at 23:12-16.

When Ms. Caskey first started as Title IX coordinator, Dr. Robinson made her aware of there being reports of sexual harassment, assault or stalking happening on campus that were handled improperly by NCF administrators.  *Id.* at 24:10-25.  She was also made aware of there being various student run parties on NCF campus that could be a Title IX concern.  *Id.* at 25:11-14.  However, no one at NCF made her aware of the 2015 task force assembled to deal with drug and alcohol use on campus, even though she should have been made aware of it as Title IX coordinator.  *Id.* at 26:12-15, 28:3-8).

Ms. Caskey agrees, based on her research, training, and education, that drug or alcohol use, especially with minors being involved, is exactly the type of behavior that, if permitted, would or could directly result in Title IX violations such as sexual harassment, assault, and stalking. *Id.* at 29:6-14).  Underage drinking on campus resulting in a sexual assault is or could result in a hostile educational environment and could certainly lead to a negative outcome on a student's access to educational opportunities.  *Id.* at 29:16-24).  Additionally, a failure by the university to address the

issue of underage drinking that regularly results in sexual assault would or could be a clearly unreasonable response to those then known circumstances.  *Id.* at 29:25-30:4.

NCF Regulations, Chapter 6, prohibits consuming alcohol by anyone less than 21 on the university's property, providing alcohol to somebody under 21 anywhere on campus, and the abusive coercion or unwanted social pressure to get someone of any age to drink alcohol (otherwise known as peer pressure).  *Id.* at 36:2-15; *see also* Defendant's Exhibit 18, New College of Regulations Manual Chapter 6 [Doc. 104] (hereinafter "Reg. Ch. 6").    Chapter 6 also restricts alcohol consumption by somebody over the age of 21 to designated areas, which did not include the Bayfront. RC Depo I at 36:16-37:12; *see also* Reg. Ch. 6.  It was the shared responsibility of student affairs and the campus police to enforce the alcohol policy and stop violations of the policy wherever they are happening.  RC Depo I at 37:13-18; *see also* Reg. Ch. 6.  Nevertheless, NCF did not give Ms. Caskey all the support that she felt she needed in her role as Title IX coordinator.  RC Depo I at 31:23-25; *see also* Reg. Ch. 6.

During her time at NCF, Ms. Caskey participated in the Student Affairs Leadership Team ("SALT") meetings at NCF with various administrators including Dean Williamson, Dean of Student Affairs, and Dr. Mark Stier, Associate Dean of Student Affairs.  *Id.* at 39:5-14; 44:16-45:8. Ms. Caskey expressed her concerns about the Title IX implications of allowing alcohol to be served at on-campus "Wall" events at these leadership team meetings and to various faculty members at NCF.  *Id.* at 39:8-21.  Not only did the school fail to take sufficient or workable steps to curb on-campus drinking, the school also provided "chill rooms" – dark spaces where students who

had too much to drink or too much drug use could rest – even though "it was well known in the Title IX community" that this practice exposed vulnerable students to potential assault. *Id.* at 41:11-42:16.

The administration of NCF knew about regular, annual, unsanctioned parties like the Easter Egg Hunt – an on-campus event involving illegal drugs or small bottles of alcohol hidden inside Easter Eggs and placed around campus for students to find – and discussed them at SALT meetings where Rebecca Caskey's concerns over the Title IX implications of allowing such a tradition to go on was met with a dismissive, deliberately indifferent response. *Id.* at 50:1-13, 64:5-65:5. Dean Williamson, despite having actual knowledge that unsanctioned student traditions revolving around drug and alcohol use were being carried out on campus by the students, took no steps at all to curb these "traditions" and dismissed Ms. Caskey's Title IX concerns. For example, Ms. Caskey testified:

> Q.    Did you express concern over that – how [events like the Easter Egg Hunt] could implicate Title IX, as the Title IX coordinator?
> A.    Yes.
> Q.    What – what did you say about that?
> A.    That any situation where students are under the influence of alcohol and drugs increases the – increases the likelihood of sexual assaults or sexual harassment or stalking.
> Q.    Okay.  So when you brought that concern up, what was the response you received and from whom?
> A.    That was [sic] not a college-sanctioned event, and New College is a very different place, and there was little or nothing that could be done about it.  And I brought it up to Dr. Williamson, and I brought it up at the SALT meeting, so everyone who I listed earlier.

*Id.* at 64:10-24.  She also raised concerns about parties and events that celebrated and encouraged dubious consent practices, or which exposed students to possible sexual

abuse, such as the "Kiss Your Crush" event or the school's sanctioning of a "Kink Positive" club.   *Id.* at 52:3-53:16, 75:2-76:2-19.   Again, her concerns were dismissed. *Id.* at 54:24-55:14, 76:3-13.   The response from the administration as to why nothing was being done to curb violations of the alcohol policy or to address the Title IX implications like sexual assault, harassment or stalking was:  "This is the way it is here. We're a very different place."  *Id.* at 45:17-46:2.

In addition to witnessing an intentional failure by Student Affairs and NCF as a whole to enforce the alcohol use policy, Title IX Coordinator, Rebecca Caskey testified to first-hand knowledge of Title IX policy not being followed.  Mark Stier, Senior Associate Dean of Student Affairs, reported directly to Dean Williamson, who reported directly to the president.  *Id.* at 78:16-25.  At one point, the provost of NCF, Barbara Feldman, asked Rebecca Caskey to compile instances of Dr. Stier compromising the well-being of students and creating an undue risk as far as Title IX or litigation concerns to the institution.  *Id.* at 79:1-6, 80:9-10; *see also id.* at Exh. 5.

At the time she took on the position of Title IX coordinator, Ms. Caskey learned from Erin Robinson of an incident involving Dean Stier in which he expelled a student without affording him due process under Title IX and without reporting the issue to the then-acting Title IX coordinator.  *Id.* at 81:22-82:19. She brought the information to the attention of her direct supervisor, Dean Williamson, who responded that it was not Ms. Caskey's business and she did not need to know about it, and later by instructing her "to never speak about it again."  *Id.* at 82:23-83:4, 83:25-84:17.  Later, Mark Stier sent confidential information about a student's Title IX report and a no

12

contact order to a student named Becca instead of Rebecca Caskey in violation of the school's policy regarding privacy of Title IX incidents, and he did so on two separate occasions. *Id.* at 84:18-86:11. Again, Dean Williamson defended Dean Stier despite the clear policy violation. *Id.* at 86:4-11.

Dean Williamson also directly interfered with a Title IX investigation and once tried to pressure Rebecca Caskey to find the alleged perpetrator responsible because the alleged victim's parents were calling the school and wanted the alleged perpetrator found responsible. *Id.* at 87:19-88:21. Ms. Caskey also testified that President Donal O'Shea once tried to intercede in a Title IX investigation and asked her to amend her findings after she found a student guilty of rape and suspended him near the time of his graduation in order to help the school's retention and graduation numbers. *Id.* at 89:12-90:14; 103:1-104:7. In addition, Mark Stier regularly failed to involve the Title IX coordinator or keep her informed about Title IX reports that he received, even though she was supposed to be notified of all Title IX complaints. *Id.* at 92:20-93:2.

**When Jane Doe reported the May 2017 rape to Dean Williamson in or around May of 2018, approximately one week before her rapist was due to graduate, the Dean told her "that there was nothing she could do now except put in for a no-contact order beginning in the Fall of 2018," and did not open an investigation.** 2d ROG Ans. at #13. Dean Williamson's statement to Jane Doe is not an accurate statement of the possible protective measures or sanctions available under Title IX, and Dean Williamson's failure to open an investigation directly

violates NCF's Title IX policy.  RC Depo I at 91:4-92:1.  Jane Doe proceeded to withdraw as a student from New College of Florida to avoid ongoing encounters with her rapist, who planned to continue on at New College of Florida for two more years to complete his Masters Degree.  *See* LinkedIn Profile for Cheikhou Kane, *available at* https://www.linkedin.com/in/cheikhou-kane, attached hereto as Plaintiff's Exhibit "D."  She then discussed her reason for leaving NCF with then-President and Secretary of the Board of Trustees, Donal O'Shea, and specifically reported to him that she was leaving because of both unaddressed bullying **and sexual harassment** on NCF's campus.  2d ROG Ans. at #13.

## III.  ARGUMENT

Summary judgment should only be granted "if the movant shows that there is ***no genuine dispute*** as to ***any material fact*** and the movant is entitled to judgment ***as a matter of law***."  Fed. R. Civ. P. 56(a) (emphasis added).  The burden is on the moving party to show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  However, an absence of evidence cannot simply be manufactured by the moving parties by leaving essential facts out of their motion as Defendants have done in this case; the Court must consider *all* the record evidence to determine if there is truly an absence of evidence to support Plaintiff's case or if Plaintiff can "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  Essentially, the Court must deny Defendant's

motion where the record evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Defendants have asked this Court to grant summary judgment as to both Plaintiff's Title IX claims and her negligence claims against each Defendant; however, summary judgment would be inappropriate as to either set of counts.  As to the Title IX claims, there is a plethora of record evidence, as laid out in the Statement of Facts above, to support each of the elements of Plaintiff's claims for Violation of Title IX, such that a reasonable jury could find Defendants liable.   As to the negligence claims, summary judgment would be inappropriate for two reasons:   first, Eleventh Amendment immunity does not apply to the negligence claims in this case, and second, Plaintiff is alleging negligence based on operational-level functions for which Florida waived sovereign immunity, not planning-level functions as argued by Defendants.

A.   **There is sufficient record evidence such that a reasonable jury could find *both* Defendants liable under Title IX due to their deliberate indifference to Plaintiff's Title IX rights before the May 13, 2017 rape *and/or* their clearly unreasonable response to Plaintiff's 2018 Title IX reports.**

The United States Supreme Court held unequivocally that "student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of 'discrimination' actionable under the [Title IX] statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999).  To succeed on a Title IX claim predicated on student-

15

on-student harassment, six elements[3] must be proven by a preponderance of the evidence: (1) that defendants are Title IX funding recipients; (2) that an "appropriate person" must have "actual knowledge of discrimination in the recipient's programs"; (3) that defendants responded with deliberate indifference to the known harassment or risk in its programs or activities; (4) the deliberate indifference "subject[ed] the plaintiff to further discrimination"; (5) the harassment is "severe, pervasive, and objectively offensive"; and (6) the harassment "effectively bar[s] the victim's access to an educational opportunity or benefit." *Garrett v. Univ. of S. Fla. Bd. of Trs.,* 824 Fed. Appx. 959, 964 (11th Cir. 2020) (citing *Davis* and *Williams*)

There is no dispute that Defendants are Title IX funding recipients. *See* Defendants' Motion for Summary Judgment [Doc. 86] at 11-12.   Moreover, Defendants have conceded, for the purposes of their Motion, that the harassment suffered by Jane Doe is "sufficiently severe, pervasive, and objectively offensive" to entitle her to relief under Title IX. *See id.* Furthermore, Defendants conceded that the harassment did "effectively bar [Jane Doe's] access to an educational opportunity or

---

[3] In *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), the court laid out **four** elements: (1) "the defendant must be a Title IX funding recipient"; (2) "an 'appropriate person' must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred"; (3) "'the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities'" such that "the funding recipient's deliberate indifference 'subjected' the plaintiff to discrimination"; and (4) "the discrimination must be 'so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'"  477 F.3d at 1293 (*quoting Davis*, 526 U.S. at 633).   The Eleventh Circuit later broke the fourth element down into two separate elements – first, that the discrimination is severe, pervasive, and objectively offensive, and second, that the harassment bars the victim's access to an educational opportunity or benefit. *Hill v. Cundiff*, 797 F.3d 948, n.11 (11th Cir. 2015).   In *Garrett* in 2020, the Eleventh Circuit broke the *Williams* elements down further by separating the third *Williams* element into two separate elements.   For the purpose of this Response, Plaintiff will discuss the cause of action in terms of six elements as laid out in *Garrett*.

16

benefit," satisfying the sixth and final element of her Title IX claim. *See id.* Only the second, third, and fourth *Garrett* elements remain disputed, but when the evidence is reviewed and taken in the light most favorable to the non-moving party, the Court will find that there is more than enough evidence to support a finding by a reasonable jury that Defendants are liable under Title IX for the deliberate indifference of their administrators to known discrimination.

> ### a. An appropriate person with the authority to address sex-based discrimination on behalf of NCF had actual knowledge of discrimination in NCF's programs.

Plaintiff is not required to show that Defendants had advanced notice that *this* perpetrator would rape *this* student at a specific time and place to satisfy the actual knowledge requirement. Rather, Title IX liability can lie where an "appropriate person" – someone with the ability to address sex-based discrimination on behalf of the defendant – had "knowledge of *sexual assaults* and [was] deliberately indifferent to those *sexual assaults*." *Shank v. Carleton College*, 232 F. Supp. 3d 1100, 1109 (D. Minn. 2017) (emphasis in original). Furthermore, "[o]nce a student reports to the 'appropriate person' at a school that he/she was sexually assaulted by *another student*, at that moment, the "actual knowledge" element for student-on-student harassment is satisfied." *S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trs.*, No. 4:16cv613-MW/CAS, 2019 WL 11254780, at *7 (N.D. Fla. Mar. 1, 2019) (hereinafter, "*FAMU*") (emphasis in original). *See also Shank*, 232 F. Supp. 3d at 1110 (finding that a Title IX claim can

exist based on a funding recipient's inadequate response to a rape, even where it did not have advanced knowledge of rapes occurring.)

> i.   As Secretary of the New College Board of Trustees, Donal O'Shea is an "appropriate person" with knowledge on behalf of Defendant, New College Board of Trustees.

Defendant does not argue in its motion that no "appropriate person" had knowledge on behalf of the University itself; however, Defendant argues that Plaintiff brought forth no evidence that someone associated with the *New College Board of Trustees* had knowledge of the discrimination.  **This is false**.  The record reflects that the President of New College of Florida is an "appropriate person" associated with the Board of Trustees in this case.  The Eleventh Circuit has affirmed the dismissal of a Title IX claim against a governing board of a university because the President of the University in that case did not serve any role on the Board of Regents of the University System of Georgia.  *Williams v. Bd. of Regents of Univ. Sys. Of Ga.*, 477 F. 3d 1282, 1293-93 (11th Cir. 2007).  However, the university president in the instant matter ***also serves*** as an Officer of the New College Board of Trustees – namely, the Secretary.  *See* New College of Florida Regulations Manual Chapter 2-1005, attached hereto as Plaintiff's Exhibit "E".  Thus, evidence of President O'Shea's knowledge of annual student-led traditions and the associated certainty of sexual assault, as well as his later knowledge of the fact that Plaintiff was quitting school because of sexual harassment, are sufficient to satisfy the "actual knowledge" requirement as to the New College Board of Trustees.

> ii.   *An appropriate person had actual knowledge that unsupervised on-campus student-led "traditions" like the Tour de Franzia consistently resulted in on-campus sexual assaults.*

The Defendants' Motion attempts to improperly narrow the "actual knowledge" element to require proof that NCF knew *this* perpetrator would rape *this* victim at *this* party; however, **that is not the standard** or the burden that the law places on Plaintiff. **Defendants had actual knowledge of student-led traditions that occurred year after year and <u>consistently resulted in discrimination</u> in the form of sexual assault, and Plaintiff suffered this exact form of discrimination at this exact type of event.** Dr. Khan advised the entire Drug and Alcohol Task Force, which reported to the President of the University and the Board of Trustees, of the correlation between these known student traditions, *including* the Tour de Franzia, and on-campus sexual assault in the summer of 2015. DK Depo I at 90:1 – 91:4. Furthermore, the on-campus police department was aware of the Tour de Franzia and other student-led traditions and expressed frustration at the ongoing existence of such events. DK Depo II at 150:8-151:5.

Knowledge of underage and excessive drinking may not, by itself, support a claim under Title IX, but the instant record reflects NCF administrators, including Dean Williamson and President/Secretary of the Board of Trustees, Donal O'Shea, knew about unsanctioned student traditions involving alcohol and drug use happening on a regular, annual basis, **and that these traditions <u>consistently resulted</u> in rapes and sexual assaults on the NCF campus**. DK Depo I at 89:16-90:16. *Shank*

dismissed a Title IX claim based solely on actual knowledge of underage drinking. 232 F. Supp. 3d at 1109. Unlike the college in *Shank*, NCF had *actual* knowledge of *sexual assaults* that were consistently occurring in connection with unsanctioned annual student "traditions" involving drinking and drug use that happened regularly on campus. Summary judgment is therefore inappropriate. Furthermore, knowledge of past sexual assaults indicating a "substantial danger to students" of future sexual assaults is sufficient to satisfy the actual knowledge requirement, and failure to address the known issue can amount to deliberate indifference. *FAMU*, 2019 WL 11254780 at *9 (quoting *Doe v. Allentown Sch. Dist.*, No. 06-1926, 2012 WL 13201474, at *1, (E.D. Pa. Mar. 21, 2012)).

As Dean of Student Affairs, Dean Williamson possessed the authority to deal with violations of the alcohol policy and events in which such violations were known to take place by banning such events, providing closer monitoring, or through other means. RC Depo I at 43:2-9. Even if we take Dean Williamson and President O'Shea at their word that they did not personally know about the Tour de Franzia, this is not the standard of proof. **The Tour de Franzia is only one of many long-established annual student-led traditions which the administration has intentionally turned a blind-eye toward, despite having actual knowledge of a link between these unsupervised, on-campus student traditions and incidents of sexual assault.** Furthermore, there is sufficient evidence that the annual student-led traditions involving drinking or drugs, **including the Tour de Franzia**, were well-known and

20

widely talked-about annual tradition for years preceding the May 13, 2017 rape of Jane Doe, including the testimony of Dr. Duane Khan about his own knowledge and discussions with on-campus police about the events, and the fact that both the Sarasota Herald-Tribune and the New College News have run articles about the Tour de Franzia and described it as an "annual student tradition".  *See* Plaintiff's Exhibit B.

It was the responsibility of student affairs to know about student activities, traditions, and parties that were done on a regular or annual basis. Deposition of Rebecca Caskey, Part II, taken June 9, 2022 [Doc. 98] at 161:9-16 (hereinafter "RC Depo II").  **In addition to just knowing about these student traditions generally, the student affairs department had actual knowledge of the May 13, 2017 Tour de Franzia, including its start and end locations, because residence assistants received the invitation and attended the event.**  *See* 2d ROG Ans. at #13.  Residence assistants are employees of the student affairs department and are required to report violations of the alcohol and drug policy up the chain to the Dean of Student Affairs.  Action by the residence assistants would have stopped the event from happening and thereby addressed the known discrimination that Jane Doe ultimately suffered; thus, an appropriate person had actual knowledge of the Tour de Franzia event.

Defendants would like to escape liability for its failure to act to stop some of the more dangerous student traditions, like the Tour de Franzia, but Title IX does not permit a funding recipient to intentionally bury its head in the sand to avoid "actual knowledge."  *See FAMU*, 2019 WL 11254780 at *9.

      iii.    *An appropriate person had actual knowledge of the harassment the moment Jane Doe reported it to Robin Williamson, Dean of Student Affairs and/or to Donal O'Shea, President of the University and Secretary of the Board of Trustees.*

In addition to knowing about the on-going danger posed to female students like Jane Doe related to unsupervised student "traditions" like the Tour de Franzia, an appropriate person with the authority to act on behalf of either defendant received "actual notice" of discrimination the moment that Jane Doe disclosed to Dean Robin Williamson, and then to President Donal O'Shea, that she'd suffered sexual assault or harassment on campus. *See FAMU*, 2019 WL 11254780 at *7. In *FAMU,* the court analyzed whether the "actual notice" requirement was satisfied following three separate rapes suffered by the same student. *Id.* at *1. After the first rape, the student-victim reported to the FAMU Department of Safety & Security, but mis-reported the name of her assailant. *Id.* at *5-*6. The *FAMU* court found that the mere reporting that *another student* had assaulted her satisfied the "actual knowledge" requirement. *Id.* at *7.

Like the student-victim in *FAMU*, Plaintiff here did report having been sexually assaulted and harassed on the NCF campus. Though Defendants may attempt to distinguish the instant case from *FAMU* based on the length of time between the rape and the report, the length of time is immaterial to the analysis of whether NCF had "actual notice." In May of 2018, Jane Doe decided she could no longer carry on the way she had been. She made an appointment to speak with Dean Williamson and signed in at Student Affairs when she arrived; she wrote "Title IX" on the sign-in sheet,

though NCF failed to retain a copy.  At that time, Jane Doe reported to Dean Williamson that a student who was about to receive his undergraduate degree had raped her.  The response she received was that nothing could be done *except* to institute a no-contact order to begin the following school year.  Plaintiff, now devoid of any hope that the school would take any steps to protect her from her rapist, left Dean Williamson's office, walked across the corridor to the Registrar's Office, and officially withdrew from New College of Florida.

What Defendants conveniently gloss over in their Motion is that the rapist, Cheikou Kane, was not graduating and leaving NCF; he was graduating with his Bachelors degree and proceeding to join NCF's Master of Science program in Data Science, which he ultimately completed in 2020.  *See* Exhibit D, LinkedIn Profile for Cheikhou Kane.  Due to NCF's inaction and indifference Kane continued as an NCF student for two more years, his own education unhindered, and obtained an advanced degree, while Ms. Doe was forced to leave the university to avoid near daily stalking by her rapist.  Whatever Dean Williamson's motives in misrepresenting the law and the school's own policy on Title IX to Jane Doe, she effectively told Ms. Doe that proceeding with the report would never result in Mr. Kane's dismissal from the school. For Plaintiff, staying at NCF would mean another two years of re-traumatization every time she would see her rapist walking near her on campus, waiting for her outside her classroom, or loitering near her dormitory.  Taking all the record evidence in the light most favorable to the Plaintiff, including Plaintiff's statements and the unbiassed testimony of Rebecca Caskey who witnessed a pattern of deliberate indifference to

students' Title IX rights on the part of Dean Williamson, there is sufficient record evidence to support a finding by a reasonable jury that an "appropriate person" had actual knowledge on behalf of New College of Florida.

Plaintiff did not just tell Dean Williamson about the rape – she also told Donal O'Shea, President of the University and Secretary of the Board of Trustees.  She had worked closely with President O'Shea and the rest of the Board of Trustees during her time serving in the student government, and she decided to say goodbye to him after disenrolling from the school.  She has and will testify that when she informed President O'Shea of her decision, he asked her why, and she told him that it was because of the bullying and sexual harassment she'd endured.  **Having received this report as both President of the University and Secretary on the Board of Trustees, this notification to Donal O'Shea that Plaintiff suffered sexual harassment on campus constitutes actual notice of a Title IX violation not just to New College of Florida, but to an "appropriate" person on behalf of the Board of Trustees.**

Plaintiff's Verified Answers to Second Interrogatories contain record evidence that Donal O'Shea had actual knowledge of Plaintiff being sexually harassed on campus.  Plaintiff states: "Shortly after I dropped out, I had a conversation with Don O'Shea about why I was leaving the university and told him about the fact that I was also being sexually harassed, and that I had reached out for help but no one helped me." (Answer to Defendant's Second Interrogatories, #5).  Taking all the evidence in the light most favorable to the Plaintiff, including Plaintiff's sworn statements and

Rebecca Caskey's unbiassed testimony that she has witnessed Don O'Shea ask her to ignore Title IX procedure to protect graduation numbers, there is sufficient record evidence that a would find actual notice on behalf the New College Board of Trustees.

**b.   NCF responded with deliberate indifference to the known acts of harassment in its programs.**

Title IX liability arising from student-on-student harassment can be based on either: (1) "deliberate indifference *before* an attack that makes a plaintiff more vulnerable to the attack" or (2) "deliberate indifference *after* an attack that causes a plaintiff to endure additional discrimination." *FAMU*, 2019 WL 11254780 at *9 (N.D. Fla. Mar. 1, 2019) (quoting *Doe v. Bibb Cnty. Sch. Dist.*, 83 F. Supp. 3d 1300, 1307 (M.D. Ga. 2015).

A Title IX funding recipient would be deliberatively indifferent "where the recipient's response is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.   This standard is "contextual: it does not require school districts to simply do *something* in response to sexual harassment; rather, they must respond in a manner that is not 'clearly unreasonable in light of the *known* circumstances.'" *Doe v. Sch. Bd. of Broward Cnty.*, 604 F. 3d 1248, 1263 (11th Cir. 2010) (quoting *Davis*, 526 U.S. at 648).   Furthermore, a finding of "deliberately indifference" can be predicated on "some evidence that the [defendant] knew of a need to train and/or supervise in a particular area, or otherwise prevent or correct the constitutional violations, and the [defendant] made a deliberate choice not to take any action." *Doe v. Sch. Bd. of Miami-Dade Cnty.*, 403 F. Supp. 3d 1241, 1264 (S.D. Fla.

2019) (quoting *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009)) (internal quotations omitted).

> i.   *NCF deliberately chose to take no action to stop known student traditions like the Tour de Franzia, despite actual knowledge of the link between parties like the Tour de Franzia and an increase incidence of sexual assaults and rapes on the NCF campus.*

Dr. Duane Khan of the New College of Florida Counseling Office specifically reported to the Drug and Alcohol Task Force that drinking events like the Tour de Franzia invariably coincided with a noticeable incidence of sexual assaults on campus. DK Depo I at 89:16-90:16.  Nevertheless, as discussed more fully below, NCF failed to enforce its existing drug and alcohol policies, despite warnings of the link between parties like the Tour de Franzia and an increased incidence of sexual assaults and rapes on campus.

Underage college students are more apt to violate alcohol and drug use policies that are not being enforced or paid attention to.  RC Depo I 34:2-6.   NCF's failure to address substance and alcohol use on campus and permitting underage drinking to occur would be unreasonable or deliberately indifferent to the Title IX implications of the inaction in light of the known circumstances.  *Id.* at 34:8-35:1.  Such a failure would evidence NCF showing deliberate indifference to instances of underage drinking it knows correlated with an increase in on-campus rapes and sexual assault.  *Id.* at 30:5-9, 30:25-31:4.  If sexual assault resulted from violations of school policy and the law on substance and alcohol use on campus, where the school knew it was occurring, NCF would be acting with willful, voluntary inaction or deliberate indifference to such

a problem. *Id.* at 31:6-13. If a sexual assault resulted from minors using alcohol where the school knew about alcohol being used on campus, that would be tantamount to the school's decision not to remedy such policy or law violations. *Id.* at 31:15-21).

The testimony of Rebecca Sarver Caskey evidences a pattern of indifference that continued right up until Jane Doe was forced to withdraw from NCF. NCF Regulations, Chapter 6, prohibits consuming alcohol by anyone less than 21 on the university's property, providing alcohol to somebody under 21 anywhere on campus, and the abusive coercion or unwanted social pressure to get someone of any age to drink alcohol (otherwise known as peer pressure). *Id.* at 36:2-15; *see also* Reg. Ch. 6 [Doc. 104]. Chapter 6 also restricts alcohol consumption by somebody over the age of 21 to designated areas, which did not include the Bayfront. RC Depo I at 36:16-37:12; *see also* Reg. Ch. 6. It was the shared responsibility of student affairs and the campus police to enforce the alcohol policy and stop violations of the policy wherever they are happening. RC Depo I 37:13-18.

NCF did not give Ms. Caskey all the support that she felt she needed in her role as Title IX coordinator. *Id.* at 31:23-25). During her time at NCF, Ms. Caskey participated in the student affairs leadership team ("SALT") meetings at NCF with various administrators including Dean Williamson, Dean of Student Affairs, and Dr. Mark Stier, Associate Dean of Student Affairs. *Id.* at 39:5-14; 44:16-45:8. Ms. Caskey expressed her concerns about the Title IX implications of allowing alcohol to be served at on-campus "Wall" events at these leadership team meetings and to various faculty members at NCF. *Id.* at 39:8-21. Not only did the school fail to take sufficient or

workable steps to curb on-campus drinking, the school also provided "chill rooms" – dark spaces where students who had too much to drink or too much drug use could rest – even though "it was well known in the Title IX community" that this practice exposed vulnerable students to potential assault. *Id.* at 41:11-42:16.

When Ms. Caskey expressed her concerns to Dean Williamson about the fact that the school's failure to enforce its policy was creating a risk of on-campus rape and sexual assault, Dean Williamson did not provide a satisfactory response; rather, Ms. Caskey found Dean Williamson's response to be indifferent to the Title IX rights of NCF students. *Id.* at 42:17-25).   As Dean of Student Affairs, Dean Williamson was in a position to deal with violations of the alcohol policy and events in which such violations were known to take place by banning such events, providing closer monitoring, or through other means.  *Id.* at 43:2-9).  Nevertheless, when Ms. Caskey expressed her concerns repeatedly at the SALT meetings that alcohol use could lead to Title IX implications like sexual assault, harassment, or stalking, the response from the administration as to why nothing was being done to curb violations of the alcohol policy was: "This is the way it is here.  We're a very different place."  *Id.* at 45:17-46:2).

Ms. Caskey observed this deliberate indifference to the rights of NCF students, including Jane Doe, firsthand.  *Id.* at 46:3-10.   When Ms. Caskey expressed her concerns to Dean Williamson about the fact that the school's failure to enforce its alcohol policy was creating a risk of on-campus rape and sexual assault, Dean Williamson responded with indifference to the Title IX rights of NCF students. *Id.* at 42:17-25.  Caskey brought up the issue of the correlation between the failure to enforce

28

the alcohol policy and on-campus sexual assault to Dean Williamson and the entire Student Affairs Leadership team multiple times, and Dean Williamson's response was essentially: "That's the way New College is. We're very different." *Id.* at 50:1-13.

Ms. Caskey also expressed concern to Dean Williamson over events such as the "Kiss Your Crush" party which celebrated dubious consent practices, but again received a deliberately indifferent response. *Id.* at 52:3-53:16. NCF fostered a general culture of indifference to drinking that could lead to various types of horrible or criminal outcomes, including Title IX violations, which the administration justified because New College is "different." *Id.* at 54:24-55:14. NCF also sanctioned a "Kink Positive" club, funded by government funds, that put on a Fetish Party in which students would invite other students to try out various sexual fetishes, and which Caskey testified had the potential to end up in a Title IX nightmare. *Id.* at 75:2-76:2-19. Her concerns, when expressed to the SALT team, were again dismissed, this time on the basis that the administration "can't impede on someone's sexual pleasure rights." *Id.* at 76:3-13.

Like the Tour de Franzia, the Easter Egg Hunt – an on-campus event involving illegal drugs or small bottles of alcohol hidden inside Easter Eggs and placed around campus for students to find – was an unsanctioned student tradition that took place annually. *Id.* at 63:19-64:20. The administration of NCF knew about the Easter Egg Hunt and discussed it at SALT meetings where, again, Rebecca Caskey's concerns over the Title IX implications of allowing such a tradition to go on was met with a dismissive, deliberately indifferent response. *Id.* at 64:5-65:5. Dean Williamson,

despite having actual knowledge that unsanctioned student traditions revolving around drug and alcohol use were being carried out on campus by the students, took no steps at all to curb these "traditions" and dismissed Ms. Caskey's Title IX concerns outright. *Id.* at 64:10-24.

Defendants will no doubt wish to discount Ms. Caskey's testimony of Robin Williamson's indifference and reluctance to take steps to protect students from sexual assault as having occurred after the rape of Jane Doe – however, this evidence is indicative of a pattern of deliberate inattention to safety and a greater concern for graduation numbers and funding matters shared by both Williamson and President O'Shea.

> ii. *After Jane Doe reported rape to Dean Williamson and sexual harassment to President O'Shea, Defendants' failure to immediately open an investigation, and failure to properly inform Jane Doe about her rights under Title IX, constituted a clearly unreasonable response to a Title IX violation report.*

Plaintiff has and will testify that she was told by Dean Williamson that the *only thing* NCF could do was issue a no contact order to begin in the 2018/2019 school year. 2d ROG Ans at #13. However, this was inaccurate and highly misleading. RC Depo I at 91:4-92:1). Although Defendants would like this Court to believe that Dean Williamson's character is unimpeachable based on the inadmissible lay opinion testimony of NCF President Donal O'Shea[4], Rebecca Caskey, who worked as Dean Williamson's administrative assistant and then worked closely with her in her role as

---

[4] *See* Defendants' Motion at page 7.

Title IX Coordinator, witnessed a pattern of deliberate indifference to the requirements of Title IX and the investigation process on the part of both Robin Williamson and other administrators.

Here, NCF responded to Jane Doe's report of sexual assault by effectively doing nothing. *See Garrett*, 824 Fed. Appx. at 965. In *Garrett*, the university immediately opened an investigation and informed the victim of all the various options for interim measures available to her after she made a Title IX report to Jonathan Monti with the USF Office of Student Rights and Responsibilities (OSRR). *Id.* at 961. The *Garrett* Court described the interaction as follows:

> During that meeting, Monti explained the interim measures and accommodations that could be put in place, but Garrett "requested that no interim measures be put in place." Monti specifically told her that USF could issue a no contact order. Garrett stated that she did not need one. Monti informed her that she could request interim measures at any time. That same day USF opened a formal inquiry and assigned an investigator to the case.

*Id.* Here, the victim, Jane Doe, reported the rape to Dean Williamson, and no interim measures *except* a no-contact order was offered; furthermore, Williamson indicated that no immediate interim measures were available, and the no-contact order could only be put in for the following school year. 2d ROG Ans. at #13. Then, when she told President O'Shea of her decision to leave school and cited "sexual harassment" as one of the reasons she'd decided to leave, he offered no interim measures at all. *Id.* Additionally, no investigation was ever commenced by either Defendant – a failure which is clearly unreasonable once a report has been made. *See Garrett*, 824 Fed. Appx. at 965.

31

Dean Williamson, a person with both the authority and the responsibility to act on a Title IX report such as the one made by Plaintiff, failed to initiate an investigation, failed to notify Plaintiff of her rights under Title IX, failed to accurately relay to Plaintiff the possible protection measures and sanctions available under Title IX, in violation of NCF's Title IX policy.   Defendant's Exhibit 19, New College of Regulations Manual Chapter 3 [Doc. 105].   Furthermore, Donal O'Shea, a person with the authority and responsibility to act on behalf of the Board of Trustees, upon receiving notice of sexual harassment from the Plaintiff, failed to take any action at all.   Unsurprisingly, neither Williamson nor O'Shea admitted to violating the law in their depositions.   However, Ms. Caskey, a completely disinterested witness, testified unequivocally that the failure to initiate an investigation into the rape of Jane Doe was absolutely consistent with what she had come to expect from both Williamson and O'Shea, thereby corroborating Jane Doe's factual account.   These failures demonstrate deliberate indifference on the part of both New College of Florida and the New College Board of Trustees.

> **c.   The deliberate indifference by NCF subjected Jane Doe to further discrimination in the form of continued harassment by the perpetrator and a loss of educational opportunities.**

A Title IX funding recipient may be held liable for damages caused by student-on-student harassment where "its deliberate indifference 'subject[s]' its students to harassment, i.e., at a minimum, causes students to undergo harassment *or makes them liable or vulnerable to it*."   *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 630 (1999).

      *i.*    *NCF's deliberate indifference to and failure to address the known risk of sexual assault and rape directly correlated to the Tour de Franzia and similar parties directly led to the rape of Jane Doe and subsequent harassment she faced.*

Jane Doe suffered the exact harm which Duane Khan warned of approximately 2 years earlier.  As discussed in Section B. *infra*, deliberate indifference can be based on an unreasonable failure to act.  Given that NCF went through the process of amending its alcohol and drug policies, and had actual knowledge of the correlation between "unsanctioned" (and therefore unsupervised) events like the Tour de Franzia and an increased incidence of sexual assault, NCF's failure to take appropriate steps to actually implement or enforce their existing policies in 2017 was both clearly unreasonable and made Jane Doe vulnerable to the sexual assault she suffered and the on-going stalking that followed in the 2017-2018 school year.

      *ii.*    *NCF's deliberate indifference to the actual report made by Jane Doe led to her disenrolling from New College of Florida in order to escape the ongoing harassment and trauma.*

Defendants' callous argument that Jane Doe no longer suffered Title IX damages after she disenrolled from NCF is both illogical and demonstrative of a basic misunderstanding of what constitutes a loss of equal educational opportunity.  **Basic common sense dictates that there is <u>no greater loss</u> of educational opportunity than being forced to <u>end</u> one's education.**  Defendant's argument that the damages due to the Title IX violations ended the day that Plaintiff disenrolled is therefore misleading; on that day, her damages multiplied.  Plaintiff's final decision to disenroll was prompted by Dean Williamson's failure to follow Title IX policy and law by

misrepresenting to Plaintiff her rights and the options available under Title IX and by failing to immediately open an investigation because Williamson's misrepresentation – that the **only** thing that could be done would be to allow the perpetrator to graduate and continue on to obtain his Master's degree at NCF, but issue a no-contact order specific to Jane Doe for the following year – left Plaintiff feeling frightened and unsafe and like there was nothing that the school could or would do to protect her from her rapist and stalker.  Then, when Plaintiff advised Don O'Shea of the reason she left the University, he failed to take any steps to mitigate Dean Williamson's failures.

The failures by both Williamson and O'Shea to initiate Title IX investigations the moment they learned of the violations subjected Jane Doe to further discrimination and lost educational opportunities.

**B.** **Plaintiff's negligence claims cannot be summarily dismissed by this Court on Eleventh Amendment or sovereign immunity grounds.**

Florida law distinguishes between operational-level and planning-level (discretionary) functions.  The failure to carry out and follow policies already in existence is an operational function for which sovereign immunity has been waived; the development of those policies would be a planning-level function.  *Doe v. School Board of Miami-Dade County*, 403 F. Supp. 3d 1241, 1266-67 (S.D. Fla. Apr. 30, 2019). "An act is 'discretionary' when all of the following conditions have been met:

> (1) the action involves a basic governmental policy, program, or objective; (2) the action is essential to the realization or accomplishment of that policy, program, or objective; (3) the action require[s] the exercise of basic policy evaluation[s], judgment[s], and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possess [es] the

requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision."

*Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1264 (11th Cir. 2001) (alterations in original) (citing *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985)). By contrast, an act is "operational" if it is "not necessary to or inherent in policy or planning, that merely reflects **a secondary decision as to how those policies or plans will be implemented**." *Id.* at 1265.

NCF were under a duty to take reasonable actions to prevent the general type of injury that Jane Doe suffered. *See McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992) (establishing Florida as a "general foreseeability" state).[5] The failure to act with reasonable prudence to enforce alcohol policies, especially given the known link between events like the Tour de Franzia and sexual assault, would breach that duty because the injuries suffered fell squarely within the generally foreseeable zone of risk posed by allowing unsanctioned annual drinking parties, like the Tour de Franzia, to occur on campus.

### a. The Eleventh Amendment does not preclude this Court from adjudicating the negligence claims because Florida's waiver of sovereign immunity for operational functions applies.

Plaintiff has alleged a failure to comply with and implement policies that were already in place, and there is substantial record evidence to support this allegation. All of the failures of the administration to enforce **existing policies** prohibiting

---

[5] In other words, Plaintiff need not show it was foreseeable that this perpetrator could rape this Plaintiff at this party; rather, plaintiff need only show that a foreseeable "zone of risk" was generally created by NCF. *See McCain*, 593 So. 2d at 502.

providing alcohol to minors and drinking alcohol on campus are evidence of negligence.  The failure of the university to supervise its Bike Shop TAs, such that a university employee could hand out boxed wine to underage students from the front stoop of the shop without any consequences or intervention by either NCF's administrators or police, is evidence of negligence.  The consistent failure of NCF's administrators to follow Title IX law and NCF's own policies, as testified to by Rebecca Caskey, is evidence of negligence.  The failure of Residence Assistants, employed by NCF, to intervene or report a known student event, which they became aware of and would have been required to report as part of their employment, is evidence of negligence.  All of these failures acted to create a generally foreseeable zone of risk in which the rape of Jane Doe and the subsequent stalking squarely fell. *See McCain*, 593 So. 2d at 502.

In *Doe v. School Board of Miami-Dade County*, the court permitted negligence claims brought in connection with Title IX and Section 1983 claims against the School Board of Miami-Dade County.  403 F. Supp. 3d 1241, 1246 (S.D. Fla. 2019).  In *School Board of Miami-Dade*, the Plaintiff specifically pled two causes of action against the defendant school board based on negligence: a count for general negligence and one for negligent failure to train.  *Id.* at 1266-67. Specifically, the negligent failure to train claim alleged "that various policies and plans have been made to protect and care for students who report sexual harassment and abuse" and that the School Board failed to train its employees as allegedly mandated by the policies.  *Id.* at 1267.  The school board sought dismissal of this claim on sovereign immunity grounds, but the court

36

found that the allegations were sufficient to survive a motion to dismiss because the existence of policies and failure to implement those policies is a type of negligence claim for which sovereign immunity has been waived in Florida. *Id.* at 1267-68. The court clarified the difference between an operational-level negligence claim and a negligence claim predicated on discretionary, planning-level functions by stating: "If, however, it is revealed upon summary judgment or at trial that no training policies exist, and/or that Plaintiff is in fact challenging the School Board's discretionary act of including or excluding certain material from its training, such a claim will be barred by sovereign immunity." *Id.* at 1268.

Like the school board in Miami-Dade County, NCF already had policies in place which Plaintiff alleges were violated by NCF's employees and agents, *see* Reg. Ch. 6 [Doc. 104] and Reg. Ch. 3 [Doc. 105], and like the school board in Miami-Dade County, NCF is seeking to have Plaintiff's claims dismissed on sovereign immunity grounds. The record reveals, and Defendant's own motion concedes, the existence of policies on alcohol consumption on campus and the existence of policies related to Title IX reports and investigations. Plaintiff is not challenging the content or substance of the policies. The negligence complained of by Plaintiff is that these policies **were not followed**, and NCF's former Director of Student Engagement and Title IX coordinator testified to these failures. *See* Argument at Section A.b. *supra*. Furthermore, she testified that he failure on the part of NCF, through its employees, to address a known student tradition that violates both the law and school policy due to underage drinking or drinking in prohibited areas of the campus would be

unreasonable or would be a failure to act in a reasonable and prudent manner.  RC Depo I at 62:2-12.

Because Plaintiff's claim for negligence alleges, and the record reflects evidence of, a failure to follow, implement, and enforce policies already in existence, dismissal of the negligence claims on Eleventh Amendment/sovereign immunity grounds would be improper.

> **b.    Defendants' argument that the Bike Shop TA's actions are outside the scope of her employment is a red herring.**

Defendant's final argument for why summary judgment should be granted on the negligence counts is that the bike shop TA that provided alcohol to minors on campus did so outside the scope of her employment.  **This is a red herring**.  The record shows negligence on the part of Dean Robin Williamson, President Donal O'Shea, the entirety of the Student Affairs Leadership Team, down to the resident assistants that attended the Tour de Franzia and did nothing to stop it, such that whether the bike shop TA's actions were within the course and scope of her employment has **no practical bearing** on whether Plaintiff should be permitted to proceed to a jury trial on the negligence counts.  *See* Argument at Section B.a. *supra*.

Moreover, the decision placed before this Court is almost exclusively whether sufficient record evidence exists such that Plaintiff could succeed on the more rigorous Title IX claim.  This Court has supplemental jurisdiction over the negligence claim purely because of the related federal questions (Title IX claims) raised in Plaintiff's complaint.  28 U.S.C. §1367.  Florida law defines "gross negligence" as conduct that

is "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." §768.72, Fla. Stat. (2017). Conscious or deliberate indifference to the rights of Plaintiff – the same standard required for Plaintiff to prevail on Title IX – is therefore a higher, stricter standard of proof than the law requires for Plaintiff to prevail on a claim of general negligence.

If this Court finds that there is sufficient record evidence of deliberate indifference on the part of the University's highest-ranking individuals, then the question of whether there is sufficient record evidence of general negligence is automatically resolved in Plaintiff's favor. Alternatively, if this Court enters summary judgment on the Title IX counts, then Plaintiff respectfully submits that the court would no longer have original jurisdiction over Plaintiff's claim and it need never consider whether there is sufficient record evidence of general negligence for the claim to survive summary judgment. Rather, the court could and should remand the negligence claims back to state court. *See* 28 U.S.C. 1367. For this reason, Defendants' argument about course and scope appears to be nothing more than an attempt to side-track the issues and improperly narrow the negligence evidence to just the actions of the TA.

## IV. CONCLUSION

Summary Judgment would be inappropriate in the instant matter because the record contains sufficient evidence that an appropriate person on behalf of each Defendant had actual notice of discrimination and acted with deliberate indifference,

39

resulting in discrimination suffered by Plaintiff, such that a reasonable jury could find in Plaintiff's favor on these issues. Defendants concede that the discrimination suffered by Plaintiff is severe, pervasive, and objectively offensive, and resulted in the loss of educational opportunities. Thus, summary judgment on the Title IX claims should be denied.

Additionally, there is no sovereign immunity or Eleventh Amendment basis for dismissal of the negligence claims because Plaintiff's claims allege negligence related to operational, not planning-level functions. Defendant has failed to address or present any colorable basis for entry of summary judgment on the negligence claim, and there is sufficient evidence in the record to support a finding by a reasonable jury that each Defendant failed to act with reasonable care. Therefore, summary judgment on the Negligence claims should also be denied.

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 6, 2023, I electronically filed the foregoing with the Clerk of Court and served the foregoing document to all counsel of record by using the CM/ECF system.

**MALLARD PEREZ, PLLC**
889 N. Washington Boulevard
Sarasota, Florida 34236
(941) 952-1682
(941) 378-1605(fax)

/s/Damian B. Mallard
Damian B. Mallard, Esq.
Fla. Bar. No. 882348
Damian@mallardperez.com
Counsel for Plaintiffs

40